**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 21, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES of AMERICA,

      Plaintiff-Appellant,

v.

LELAND JEREMY LOPEZ,

      Defendant-Appellee.

No. 04-1223

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 03-CR-279-N)**

---

James C. Murphy, Assistant United States Attorney (John W. Suthers, United States Attorney, Robert Kennedy and Suneeta Hazra, Assistant United States Attorneys, with him on the briefs), Denver, Colorado, for Plaintiff-Appellant.

William Herringer, Durango, Colorado, for Defendant-Appellee.

---

Before **TACHA,** Chief Judge, **McKAY,** and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

      The United States ("Government") appeals the district court's decision to

suppress Defendant-Appellee Leland Jeremy Lopez's two confessions to killing

Dalton Box. The district court concluded that Lopez's confessions were the product of police coercion and, thus, involuntary. Having jurisdiction under 18 U.S.C. § 3731, we AFFIRM.

## I. FACTS

Viewed in the light most favorable to Lopez, who was the prevailing party, see United States v. Minjares-Alvarez, 264 F.3d 980, 983-84 (10th Cir. 2001), the evidence presented at the suppression hearing indicated the following: On May 18, 2003, at approximately 4:30 a.m., Dalton Box was shot to death as he left a party at Valentina Wing's home in Towaoc, Colorado, on the Ute Mountain Ute Indian Reservation in southwestern Colorado. Two eyewitnesses identified thirty-three year old Lopez as the shooter. One of these eyewitnesses told police that Lopez knocked Box to the ground with the first shot and then walked over to the fallen Box and shot him several more times before kicking him in the head.

Police arrested Lopez at approximately 12:30 p.m. that same day and took him to the Towaoc police station. There, at approximately 1:30 p.m., Bureau of Indian Affairs ("BIA") Agent James Hopper and Federal Bureau of Investigation ("FBI") Agent John Wallace gave Lopez his Miranda[1] warnings. Lopez agreed to talk to the agents, and they interviewed him for approximately an hour. During this interview, Lopez denied shooting Box and told the agents that he had been at

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

his mother's home asleep when the shooting occurred. Lopez agreed to a gunshot residue test, which was conducted at this time. During this first interview, Lopez asked to talk to his mother. Although the agents said he could talk to her, Lopez was never permitted to do so.

After talking to several other witnesses, Agents Hopper and Wallace again interviewed Lopez at 9:00 p.m. that same day. By this time, Lopez had slept and appeared more rested than he had during the first interview earlier in the day. He was, however, in pain from a beating that he had received two days earlier, on May 16, when he was not in custody, a beating which apparently precipitated the shooting. Although officers had offered Lopez food during the day, Lopez could not eat solid food because his jaw had been broken during the May 16 beating.

At the start of this second interview, the agents again gave Lopez his Miranda warnings, after which Lopez again agreed to talk to the agents. Initially, Lopez reiterated that he had been home asleep at 4:00 a.m. that morning, when the killing occurred. Lopez, however, suggested two of his friends, Mondo McCook and Corey Morris,[2] might have shot Box.

The agents then insinuated that the gun residue test they had conducted on Lopez earlier in the day had produced positive results, even though the agents had

---

[2]     Agent Wallace refers to this individual as Corey Wing, although it appears Morris is the correct name.

not actually yet received any test results. Further, the agents told Lopez that they had up to six witnesses who had identified him as the shooter, when in fact they had just two eyewitnesses. Finally, the agents misrepresented to Lopez that they had found his footprints at the crime scene; they had, in fact, found footprints, but had not identified whose they were.

In addition to these misrepresentations, Agent Hopper told Lopez that Hopper would prove Lopez's mother was a liar if she tried to corroborate Lopez's alibi of being asleep at her house at the time of the killing. Lopez interpreted this to mean that if his mother testified on his behalf, the Government "would make her a liar on the stand."

Agent Hopper also took two pieces of paper and wrote the words "mistake" and "murder" on them and asked Lopez whether his killing Box was an accident or intentional murder. Agent Hopper then asked Lopez to make a choice. The agent took two more pieces of paper and wrote the numbers six and sixty on them. Lopez testified that Agent Hopper told him "if you cooperate, you know, . . . you could be looking at six years. And if you don't cooperate and give us answers, you could be looking at 60 years."

Agent Hopper also told Lopez about a murder case in which the suspects had cooperated and gotten less time than the suspects who had not cooperated.

According to the agent, the suspects in that other case were "treated leniently" because the crime had been a mistake.

At 10:18 p.m., over an hour into the second interview, a crying Lopez told the agents that he had shot Box by mistake. Lopez testified at the suppression hearing that he admitted to shooting Box in order to avoid spending sixty years in jail, as well as to prevent his mother from being prosecuted. For the next two hours, Lopez gave the agents the details of his shooting Box. The agents testified that, while Lopez was telling them about the killing, he was crying and would "go in and out of sobbing." This second interview lasted almost four hours, ending at approximately 12:45 a.m. on May 19.

Agent Hopper and an officer from the Cortez, Colorado police department again interviewed Lopez at approximately noon on May 19, before taking Lopez to court for his initial appearance. This third interview lasted only thirty minutes. In between the second and third interviews, Lopez had slept and had breakfast. At the start of the third interview, Agent Hopper again gave Lopez his Miranda warnings, after which Lopez agreed to talk with the officers. A crying Lopez again confessed, reiterating the story he had told the agents the night before. At the end of this interview, Lopez asked Agent Hopper if the agent would give Lopez a hug, and Agent Hopper obliged this request.

A grand jury indicted Lopez, charging him with malice aforethought murder occurring within Indian country, in violation of 18 U.S.C. §§ 2, 1111, 1153.[3] Lopez moved to suppress the statements he had made in each of the three interviews he had with the federal agents on May 18 and 19. After an evidentiary hearing, the district court denied the motion to suppress Lopez's statements from the first interview, but granted the motion to suppress his confessions given during the second and third interviews. The Government appeals the district court's decision to suppress Lopez's confessions.

## II. STANDARD OF REVIEW

"In reviewing the district court's order granting or denying a motion to suppress, this court accepts the district court's factual findings unless clearly erroneous and considers the evidence in the light most favorable to the district court's determination." United States v. Toles, 297 F.3d 959, 965 (10th Cir.

---

[3] Title 18, U.S.C. § 1153(a) provides that "[a]ny Indian who commits against the person or property of another Indian or other person any of the following offenses, [including] murder . . . shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." The indictment alleged that both Lopez and Box were enrolled members of the Ute Mountain Ute Indian Tribe.

18 U.S.C. § 1111(a) proscribes murder, defined in part as "the unlawful killing of a human being with malice aforethought." And 18 U.S.C. § 2(a) further provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

2002).  "We are mindful that at a hearing on a motion to suppress, the credibility of the witnesses and the weight given to the evidence, as well as inferences and conclusions to be drawn therefrom, are matters for the trial judge."  Id. (quotation omitted).  However, "[w]e review de novo the ultimate issue of whether a statement was voluntary, taking into account the totality of the circumstances surrounding the confession."  Minjares-Alvarez, 264 F.3d at 984 (quotations, citation omitted).  In conducting this review, this "court must examine the entire record and make an independent determination of the ultimate issue of voluntariness."  United States v. Lugo, 170 F.3d 996, 1004 (10th Cir. 1999) (quotation omitted).

### III.  ANALYSIS

The Government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary.  See Missouri v. Seibert, 542 U.S. 600, 608 n. 1 (2004).  The question this court must resolve is whether

> the confession [is] the product of an essentially free and unconstrained choice by its maker?  If it is, if he has willed to confess, it may be used against him.  If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

United States v. Perdue, 8 F.3d 1455, 1466 (10th Cir. 1993) (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)); see also Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973).  Further, "[w]hen the government obtains incriminating

statements through acts, threats, or promises which cause the defendant's will to be overborne, it violates the defendant's Fifth Amendment rights and the statements are inadmissible at trial as evidence of guilt." Toles, 297 F.3d at 965. This court determines the voluntariness of a confession based upon the totality of the circumstances, considering "both the characteristics of the accused and the details of the interrogation." Id. at 965-66. "No single factor is determinative." Lugo, 170 F.3d at 1004.

The Government first argues that the district court erred by basing its decision to suppress Lopez's confessions on a single factor – that Agent Hopper induced Lopez's confessions by promising him leniency. The district court did note that "[i]f 'a policeman . . . has made a promise of . . . leniency,' the resulting statement is 'the product of inducement, and thus' involuntary." Reading the district court's decision in its entirety, however, it is clear that the district court properly considered and weighed all the factors relevant to the voluntariness of Lopez's confessions. See Arizona v. Fulminante, 499 U.S. 279, 285-86 (1991).

A.    First confession.

We now turn to the question of whether Lopez's first confession made during the second interview, on the evening of May 18, was voluntary. The voluntariness determination reflects

> an accommodation of the complex of values implicated in police
> questioning of a suspect. At one end of the spectrum is the

acknowledged need for police questioning as a tool for the effective enforcement of criminal laws. . . . At the other end of the spectrum is the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice. In cases involving involuntary confessions, th[e Supreme] Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.

Bustamonte, 412 U.S. at 224-25 (quotation, alterations omitted).

The determination of voluntariness is based on the totality of the circumstances. Relevant circumstances embrace both the characteristics of the accused and the details of the interrogation. Such factors include (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment.

Toles, 297 F.3d at 965-66 (citations omitted); see also Bustamonte, 412 U.S. at 226. Here, we address first the details of the interrogation, before considering Lopez's personal characteristics, because his personal characteristics "are relevant only if this court first concludes that the officers' conduct was coercive." United States v. Erving L., 147 F.3d 1240, 1249 (10th Cir. 1998).

### 1. Details of the interrogation.

The most troublesome detail about the interrogation is Agent Hopper's use of the pieces of paper marked with the terms "murder," "mistake," "60," and "6." The district court found that Agent Hopper's use of these papers amounted to a promise of leniency.

> The message that Hopper intended to convey from these sheets of paper is clear – Hopper used these sheets of paper to inform [Lopez] that if he stated that his alleged actions were a mistake, he would get six years in prison. On the other hand, if [Lopez] did not confess and explain that his actions were the result of a mistake, he would face sixty years in prison. . . . [T]his is not a vague and non-committal promise. . . . Rather, it is a promise that [Lopez] will spend fifty-four fewer years in prison if he confesses.

The Government challenges the district court's characterization of Agent Hopper's actions as a promise to Lopez of leniency if he were to confess to killing Box by mistake. The district court's determination that Agent Hopper's actions amounted to a promise of leniency is a factual finding. See United States v. Morris, 247 F.3d 1080, 1089, 1090 (10th Cir. 2001) (determining that district court's factual finding, that officers' actions in showing a suspect photos of "past criminals" and telling the suspect that the ones who cooperated had received more lenient sentences was not a promise of leniency, was not clearly erroneous); see also Toles, 297 F.3d at 966 (holding that "the district court's finding that there was no evidence of any . . . promise made in exchange for [the defendant's] statements is not clearly erroneous"); Griffin v. Strong, 983 F.2d 1540, 1540-41, 1543 (10th Cir. 1993) (noting, in 42 U.S.C. § 1983 action in which the plaintiff alleged that the defendant coerced the plaintiff into make incriminating statements during a criminal investigation, jury made factual finding as to whether the defendant made promises of lesser punishment to the § 1983 plaintiff); Reed v. Turner, 444 F.2d 206, 208 (10th Cir. 1971) (noting, in state prisoner's habeas

- 10 -

proceeding, that "it is for the trier of the facts to determine whether promises by an official were made"). Further, "the reasonable inferences drawn from the evidence fall within the province of the district court." United States v. Kimoana, 383 F.3d 1215, 1220 (10th Cir. 2004). Here, we cannot say that the district court's factual finding—that Agent Hopper's use of the pieces of paper marked "mistake," "murder," "6," and "60" was a promise of leniency—was clear error. See Morris, 247 F.3d at 1090.

"Under Supreme Court and Tenth Circuit precedent, a promise of leniency is relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced." Clanton v. Cooper, 129 F.3d 1147, 1159 (10th Cir. 1997) (citing cases). And while this court has held that the fact that an officer promises to make a defendant's cooperation known to prosecutors will not produce a coerced confession, see United States v. Roman-Zarate, 115 F.3d 778, 783-84 (10th Cir. 1997) (citing cases), that is not what occurred in this case. Rather, as the district court found, "[T]his is not a vague and non-committal promise. This is also not a promise to make defendant's cooperation known to the United States Attorney or the Judge, which courts condone." As found by the district court, Agent Hopper used the terms "mistake," "murder," "6," and "60," in order to promise Lopez that he would spend fifty-four fewer years in prison if he would confess to killing Box by

mistake.  Thereafter, Agent Hopper reinforced this promise of leniency by telling Lopez about other suspects who had received lenient sentences after confessing to killing by mistake.  Accordingly, the promise of leniency presented in this case is not a type of "limited assurance" which we have held to be a permissible interrogation tactic.  See United States v. Lewis, 24 F.3d 79, 82 (10th Cir. 1994). Rather, the nature of this promise is of the sort that may indeed critically impair a defendant's capacity for self-determination.  See Perdue, 8 F.3d at 1466-67.

In addition to Agent Hopper's promise to Lopez of leniency, the record, read favorably to Lopez, also supports the conclusion that the federal agents also misrepresented and exaggerated the evidence they had against Lopez.  "It is well-settled that a confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him."  Clanton, 129 F.3d at 1158 (addressing 42 U.S.C. § 1983 claim); see also Lucero v. Kerby, 133 F.3d 1299, 1303, 1311 (10th Cir.1998) (citing cases; addressing state prisoner's habeas petition).  Nevertheless, in this case, the agents' misrepresentation of the evidence against Lopez, together with Agent Hopper's promise of leniency to Lopez if he confessed to killing Box by mistake, are sufficient circumstances that would overbear Lopez's will and make his confession involuntary.  See Clanton, 129 F.3d at 1158-59.

There are certainly factors in this case that may, to some extent, have mitigated these coercive circumstances. The agents did give Lopez his <u>Miranda</u> warnings before talking to him. And Lopez confessed only one hour into the interrogation. But, under the facts of this case, these factors were not sufficient to eliminate the government coercion that produced Lopez's confession. <u>Cf.</u> <u>United States v. Bustillos-Munoz</u>, 235 F.3d 505, 517 n. 8 (10th Cir. 2000) (noting "[a] suspect cannot be subjected to invalid coercion to obtain a confession just because he earlier was given a valid <u>Miranda</u> warning").

### 2. Characteristics of accused.

In determining whether Lopez's confession was involuntary, we also consider Lopez's personal characteristics. <u>See</u> <u>Toles</u>, 297 F.3d at 966. The record contains little evidence to indicate that Lopez "was unusually susceptible to coercion because of age, lack of education, or intelligence." <u>Id.</u> (quotation omitted). Lopez was thirty-three years old and had completed the eleventh grade. There is nothing to suggest that he has "a limited intelligence." <u>Id.</u> Further, Lopez had been arrested and given <u>Miranda</u> warnings on earlier occasions, "indicating that he had previous experience with the criminal justice system." <u>Toles</u>, 297 F.3d at 966.

During this interview, however, Lopez was suffering from the beating he had received two days earlier, when he was not in police custody. Nevertheless,

Lopez does not suggest that these injuries affected his decision to confess. Cf. United States v. Morris, 287 F.3d 985, 987-89 (10th Cir. 2002) (holding hospitalized suspect was not mentally impaired, and knowingly and voluntarily waived his Fifth Amendment right against self-incrimination, even though suspect had been in hospital for ten days after being shot twice and was taking "mild" painkiller). Moreover, there is no evidence that the agents "withheld his medication in an effort to coerce [Lopez's] confession" or took any other actions to use Lopez's injuries to coerce his confession. McGregor v. Gibson, 219 F.3d 1245, 1254 (10th Cir. 2000), overruled on others grounds on reh'g en banc, 248 F.3d 946 (10th Cir. 2001).

Lopez's personal characteristics, therefore, do not suggest he was unusually susceptible to coercion.

### 3. Conclusion.

Despite our conclusion about Lopez's personal characteristics, we conclude that the "totality of the circumstances" surrounding the interrogation, and in particular the federal agents' promising Lopez that he would spend 6 rather than 60 years in prison if he admitted to killing Box by mistake and the Agents' misrepresenting the strength of the evidence they had against Lopez, resulted in Lopez's first confession being coerced and, thus, involuntary. The district court, therefore, did not err in suppressing that confession.

**B.    Second confession.**

The Government argues that, even if Lopez's first confession is inadmissible, his second confession should not be suppressed, notwithstanding the coercion that produced the first confession.  We cannot agree.

"[T]he appropriate inquiry in determining the admissibility" of Lopez's second confession "is whether the coercion surrounding the first [confession] had been sufficiently dissipated so as to make the second statement voluntary."[4] Perdue, 8 F.3d at 1467 (quotation omitted).

> The government must show intervening circumstances which indicate that the second confession was insulated from the effect of all that went before.  The later confession will be admissible while the first confession will not only if such a distinction is justified by a sufficiently isolating break in the stream of events.

Id. at 1467-68 (quotation, citations, alterations omitted).  This "depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances."  Lyons v. Oklahoma, 322 U.S.

---

[4]    Oregon v. Elstad, 470 U.S. 298 (1985), does not control this case. See Perdue, 8 F.3d at 1468 n. 7.  "In Elstad, the Supreme Court held that the 'fruit of the poisonous tree' doctrine does not apply to confessions obtained after an initial confession that was voluntary but not preceded by Miranda warnings." Perdue, 8 F.3d at 1468 n. 7.  There was no such Miranda violation in this case; rather, the problem here is that the first confession was involuntary.  See Perdue, 8 F.3d at 1468 n. 7; see also United States v. Rith, 164 F.3d 1323, 1333 (10th Cir. 1999).

596, 602 (1944). In making this determination, we again consider the totality of the circumstances. See Darwin v. Connecticut, 391 U.S. 346, 349 (1968).

In this case, although Lopez's second confession came after a night's sleep and a meal, and almost twelve hours elapsed between confessions, the coercion producing the first confession had not been dissipated. See Clewis v. Texas, 386 U.S. 707, 710-12 (1967) (holding third confession suspect gave, nine days after being arrested, was involuntary because there was "no break in the stream of events" beginning when police first arrested the suspect); cf . United States v. Bayer, 331 U.S. 532, 539-41 (1947) (holding second confession made six months after coerced confession was voluntary and admissible). The first confession was coerced primarily by Agent Hopper's improper promise of leniency to Lopez and Agents Hopper and Wallace misrepresenting the evidence they had against Lopez. Agent Hopper was again the primary interrogator during the third interview, which took place in the same place as the earlier interrogation. Cf. Lyons, 322 U.S. at 604-05 (holding second confession, given twelve hours after coerced confession, was voluntary where suspect had been transferred to another location and interrogated by different questioners in non-coercive environment); Leon v. Wainwright, 734 F.2d 770, 773 (11th Cir. 1984) (holding second confession was voluntary where first confession was coerced by threats and physical abuse occurring at time of arrest but suspect gave second confession several hours later

at the police station, after receiving <u>Miranda</u> warnings and being questioned by different interrogators), <u>cited in</u> <u>Perdue</u>, 8 F.3d at 1467-68. And Lopez had not spoken to an attorney or family member during the twenty-four hours since he had been arrested. <u>Cf.</u> <u>Darwin</u>, 391 U.S. at 349 (holding second confession was not voluntary where suspect was held incommunicado for thirty to forty hours). In addition, there is no indication that Agent Hopper or any other police officer made any statements to Lopez that might have dissipated the coercive effect of Agent Hopper's promises of leniency and his misrepresentation of the evidence against Lopez. In light of these circumstances, the district court in this case did not err in suppressing that confession as well.

## III. CONCLUSION

For these foregoing reasons, we AFFIRM the district court's decision to suppress both of Lopez's confessions.