**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SHANE THOMAS YOUNG,

    Defendant - Appellant.

No. 18-6221

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:18-CR-00096-HE-1)**
_____

Howard Pincus, Assistant Federal Public Defender, Denver, Colorado (Virginia Grady, Federal Public Defender, Denver, Colorado with him on the briefs) for Defendant-Appellant.

Steven Creager, Assistant United States Attorney, Oklahoma City, Oklahoma (Timothy Downing, United States Attorney, and Nicholas Patterson, Assistant United States Attorney, with him on the brief) for Plaintiff-Appellee.
_____

Before **LUCERO**, **KELLY**, and **PHILLIPS**, Circuit Judges.
_____

**LUCERO**, Circuit Judge.
_____

Defendant Shane Young appeals the district court's denial of his motion to suppress a confession. He argues the confession was involuntary because the law enforcement officer who interrogated him deceived him about having access to the

federal judge on the case. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand to the district court.

## I

In the early morning hours of March 16, 2018, a Woodward County Sheriff's Office deputy observed Young's vehicle swerving on the roadway and signaled for Young to stop his car. Young continued to drive, ultimately pulling into a nearby residential property, stopping his car, and fleeing on foot. The deputy pursued, tasing and arresting Young. After the arrest, the deputy retraced Young's path and found a small headphones case containing about four grams[1] of a mixture or substance containing methamphetamine. Young was released later that day.

In the late afternoon of March 16, officers returned to the area and found a black bag containing about 93 grams of a mixture or substance containing methamphetamine near where Young stopped his car. A resident of the property stated that he did not recognize the bag the deputies had found in his yard and had not observed anyone walking around the property earlier that day. Later that night, the deputy rearrested and interviewed Young. Young admitted to possessing the smaller quantity of methamphetamine but denied that the larger quantity was his. He then cut off questioning and revoked his consent to speak.

---

[1] The record alternately states the quantity in the headphones case was 3.5 grams and 4 grams. The amount does not affect the outcome of this appeal.

Four days later, while still held in the county jail, Young was interrogated by Federal Bureau of Investigations Special Agent Kent Brown and a state narcotics agent.[2] Agent Brown advised Young of his <u>Miranda</u> rights, which he waived. At the beginning of the interrogation, Young informed the agents that he was concerned about who would pick up his pregnant fiancée on her release from rehab the next day and worried about how criminal charges would affect his ability to raise his new baby. He told the agents he was sick to his stomach and wanted to "roll over and die." Agent Brown told Young that he tried to help people in trouble if they were trying to "do what's right and get on the right path," and that after their conversation he would do his best to try and help.

Agent Brown then told Young he had gone to Oklahoma City the prior afternoon to meet with the Assistant United States Attorney and brief the prosecutor about Young's arrest. He said the prosecutor had met with the judge. Agent Brown then showed Young a federal warrant for his arrest. Young was visibly shocked. Agent Brown told Young he wanted to proceed from the "bad news" that Young was facing federal charges "to the good news." He urged Young to trust him and told him that "from this moment on, I'm on your side." Young queried, "Is any of this going

_____

[2] A video recording of the interrogation was introduced at the suppression hearing. There are no allegations that the footage has been doctored or altered, so we may rely on this video evidence. <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 381 (2007) (holding appellate court "should have viewed the facts in the light depicted by the videotape"); <u>cf.</u> <u>Carabajal v. City of Cheyenne, Wyo.</u>, 847 F.3d 1203, 1207 (10th Cir. 2017) ("[W]e cannot ignore clear, contrary video evidence in the record depicting the events as they occurred.").

to help me?"  Agent Brown responded, "Yes, absolutely," and pivoted again to the "good news," telling Young that he was on his side and that Young had to trust him.

Agent Brown continued, describing his trip to Oklahoma City the previous day to obtain the federal warrant and telling Young that he had spoken with the judge who had reviewed the case.  He said the judge had looked at Young's criminal record.  Agent Brown emphasized that he was "not bullshitting" and repeatedly told Young to trust him.  Then, he told Young that with the smaller amount of methamphetamine, the judge was willing to charge "anywhere from five to ten years."  Agent Brown said that Young had two options and that he could "physically buy down the amount of time you see in a federal prison," with the difference depending on Young's "willingness to own to the information."  He continued, "every time you answer a question truthfully, it ticks time off that record, it ticks time off how much you're going to actually see."  He also repeatedly told Young that he would go back to the judge and tell him what Young said at the interview, invoking his supposed relationship with the judge numerous times.  Agent Brown reiterated yet again that Young needed to trust him, and he asked Young about the bag with the larger quantity of drugs in it, suggesting that Young could explain that he threw the bags in different directions as he ran from the car.

In response, Young wondered aloud whether he should have a lawyer present. Then, he said, "I want to help myself out, man, but at the same time I feel like I'm buying the farm."  Following Agent Brown's earlier suggestion, Young admitted that after he exited his vehicle, he lost his grip on the containers of methamphetamine,

4

and they flew in different directions as he was running away.  He also provided information about the source of the methamphetamine and about his drug-dealing activities.

After his confession, Young was charged with possession with intent to distribute approximately 97 grams of a mixture or substance containing a detectable amount of methamphetamine.  He moved to suppress his confession as involuntary.  The district court held a suppression hearing, at which Agent Brown testified that his "number of mentions" of having spoken with the judge were all "error[s] in specificity of speech" and that his intent was to say "prosecutor."  Agent Brown also stated that at the time of Young's interview, although he had spoken about the case to the federal magistrate judge who signed Young's warrant, they had not discussed potential charges.  Agent Brown further testified that he did not know the actual sentencing range for the offenses for which Young was charged and that when he used the five- to ten-year figure, he was providing a tangible number to explain to Young that "cooperation can pay dividends."

Although the court found Agent Brown made false representations and improper promises of leniency that were "coercive in nature under the circumstances," it ultimately concluded Young's confession was not involuntary and denied his motion to suppress.  Young pled guilty and was sentenced to 188 months' imprisonment and five years' supervised release.  He timely appealed.

5

## II

"When a party challenges a district court's ruling on a motion to suppress a confession, we review its conclusions of law de novo and its factual findings for clear error. We consider the evidence in the light most favorable to the district court's determination." United States v. Pettigrew, 468 F.3d 626, 633 (10th Cir. 2006) (citation omitted). Thus, "when reviewing the denial of a motion to suppress, an appellate court must consider the evidence adduced at the suppression hearing . . . in the light most favorable to the Government." United States v. Rodebaugh, 798 F.3d 1281, 1290 (10th Cir. 2015) (alteration and quotation omitted).

"[C]onvictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand." Rogers v. Richmond, 365 U.S. 534, 540 (1961). "To be admiss[i]ble, a confession must be made freely and voluntarily; it must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort." Griffin v. Strong, 983 F.2d 1540, 1542 (10th Cir. 1993). Voluntariness is determined under the totality of the circumstances, and no single factor is determinative. See United States v. Lopez, 437 F.3d 1059, 1063 (10th Cir. 2006).

The district court found that Agent Brown made false representations to Young when he stated that he was "on your side" and that he had discussions with the judge about Young's charges and sentence. It also found Agent Brown's statement that Young could "buy down" his time by answering questions truthfully was a promise of leniency. Its findings that there were false representations and promises of

6

leniency are factual findings subject to clear error review. See id. at 1062, 1064.

The government does not challenge these findings on appeal.

We review de novo the legal conclusion that Young's statement was voluntary. Id. at 1062. The government bears the burden of showing voluntariness by a preponderance of the evidence. Id. at 1063. "The central consideration in determining whether a confession has been coerced always involves this question: did the governmental conduct complained of bring about a confession not freely self-determined?" Griffin, 983 F.2d at 1543 (quotations omitted). Put another way, the issue is whether the confession is "the product of an essentially free and unconstrained choice by its maker." United States v. Perdue, 8 F.3d 1455, 1466 (10th Cir. 1993) (quotation omitted). If not, "if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." Id. (quotation omitted). The inquiry is based on the totality of the circumstances and requires consideration of "both the characteristics of the accused and the details of the interrogation." United States v. Toles, 297 F.3d 959, 966 (10th Cir. 2002). This test "does not favor any one of these factors over the others—it is a case-specific inquiry where the importance of any given factor can vary in each situation." Sharp v. Rohling, 793 F.3d 1216, 1233 (10th Cir. 2015).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" Colorado v. Connelly, 479 U.S. 157, 167 (1986). Accordingly, we first address Agent Brown's conduct—his misrepresentations and promises of leniency. We then turn to other factors that may contribute to

7

involuntariness, including the defendant's mental condition. See id. at 164 ("[A]s interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus."); United States v. Erving L., 147 F.3d 1240, 1249-50 (10th Cir. 1998) (defendant's personal characteristics relevant if officers' conduct coercive).

A

Promises of leniency are "relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced." Clanton v. Cooper, 129 F.3d 1147, 1159 (10th Cir. 1997), overruled on other grounds by Becker v. Kroll, 494 F.3d 904 (10th Cir. 2007). Similarly, an officer's deceptions or misrepresentations may, but do not necessarily, render a confession coerced. See Lopez, 437 F.3d at 1065.

During the interrogation, Agent Brown told Young that he was facing a sentence of five to ten years' imprisonment and that the length of the sentence depended primarily on Young's cooperation. He also told Young he could "physically buy down the amount of time you see in a federal prison." These were misrepresentations. Possession with intent to distribute 97 grams of a mixture or substance containing methamphetamine carries a minimum sentence of five years and a maximum sentence of forty years. 21 U.S.C. § 841(b)(1)(B). In contrast, possession with intent to distribute four grams of a mixture or substance containing methamphetamine carries a maximum sentence of 20 years and no mandatory

8

minimum. § 841(b)(1)(C). The latter may also be prosecuted as simple possession, with a maximum sentence of one, two, or three years depending on the defendant's prior criminal history. 21 U.S.C. § 844(a). Similarly, under the Sentencing Guidelines, possession of 97 grams of a mixture or substance containing methamphetamine corresponds to a much longer sentence than possession of four grams, contrary to Agent Brown's misrepresentations.

Although we do not require a law enforcement officer to inform a suspect of the penalties for all the charges he may face, if he misrepresents these penalties, then that deception affects our evaluation of the voluntariness of any resulting statements. In this interrogation, Agent Brown misrepresented the law to Young, a factor that weighs in favor of concluding his actions were coercive. See Clanton, 129 F.3d at 1158 ("[C]ourts are much less likely to tolerate misrepresentations of law.").

Although "the fact that an officer promises to make a defendant's cooperation known to prosecutors will not produce a coerced confession," Lopez, 437 F.3d at 1064, Agent Brown did not merely inform Young that cooperation would be viewed favorably by the prosecutor. Instead, Agent Brown repeatedly told Young he had spoken with a federal judge who had reviewed the case. He emphasized to Young that he would tell the judge whether Young had cooperated and that cooperation would "physically buy down the amount of time you see in a federal prison." He said, "every time you answer a question truthfully, it ticks time off that record, . . . that's the way it works." But that is not the way the federal system works. Agents

9

do not provide information directly to federal judges for use in determining the

charges or sentences suspects face.

At the suppression hearing, Agent Brown tried to walk back his statements

about talking to the "judge," testifying that he had meant to refer to the prosecutor.[3]

But we do not consider what Agent Brown intended to say.  Rather, we view the

coercive nature of assertions from the standpoint of the defendant.  See United States

v. Walton, 10 F.3d 1024, 1029 (3d Cir. 1993); United States v. Shears, 762 F.2d 397,

402 (4th Cir. 1985) (evaluating "the defendant's perception of what government

agents have promised").

Turning to Agent Brown's promises of leniency, we have held that "a promise

of leniency is relevant to determining whether a confession was involuntary and,

depending on the totality of the circumstances, may render a confession coerced."

Clanton, 129 F.3d at 1159; see also Griffin, 983 F.2d at 1543 ("Where a promise of

leniency has been made in exchange for a statement, an inculpatory statement would

be the product of inducement, and thus not an act of free will." (quotations omitted));

cf. United States v. Nguyen, 155 F.3d 1219, 1223 (10th Cir. 1998) (holding statement

that prosecutor will be informed of defendant's cooperation does not, without more,

constitute a promise of leniency).  In this case, Agent Brown told Young he could

---

[3] The district court did not explicitly rule on whether it credited Agent Brown's explanation.  It ultimately determined that even if credited, the explanation did "not change the coercive nature of the assertions when viewed from the standpoint of the defendant."

10

"physically buy down" the length of the sentence and that each truthful response would "tick[] time off" his sentence.[4]

We faced a similar situation in Lopez. In that case, law enforcement officers wrote the words "mistake," "murder," "6," and "60" on slips of paper to show the defendant he would receive a six-year sentence if he cooperated and a sixty-year sentence if he did not. 437 F.3d at 1064. We held this was not a permissible "limited assurance," but rather an improper promise of leniency "of the sort that may . . . critically impair a defendant's capacity for self-determination." Id. at 1065. The government contends that Lopez is distinguishable because it involved a quid pro quo promise of leniency, arguing that Agent Brown's improper promises were not as specific as the agents' promises in Lopez. We are not persuaded.

In Lopez, we held the defendant's confession was involuntary because of the officers' promise of leniency, combined with their misrepresentation or exaggeration of the evidence against the defendant. Id. at 1064-65. The government argues, and Young does not contest, that Agent Brown did not misrepresent or exaggerate the evidence against him. But like the officers in Lopez, Agent Brown made inaccurate representations about the sentence Young faced and promised leniency if Young incriminated himself. Critically, Agent Brown also made improper representations

---

[4] Although Agent Brown did tell Young he made no promises as to a particular sentence or disposition, he did not explicitly say so until after Young incriminated himself.

11

about his purported access to a federal judge—misconduct as coercive as the officers' misrepresentation or exaggeration of the evidence in Lopez.

The government points out that just four days before Agent Brown's interrogation,[5] Young stopped the sheriff's deputy's interrogation by revoking his consent to speak. The government argues that this shows that Young generally knew he could stop an interrogation. In contrast, about eleven minutes into Agent Brown's questioning, Young confessed. By that time, Young had been confronted with a federal arrest warrant and told that federal charges had been filed against him. But the main difference between the two interrogations is that before the second, Agent Brown misrepresented the law and made false promises of leniency, including a particularly troubling false promise of access to the federal judiciary.[6] Young's awareness that he could stop the interrogation did little to mitigate the coercive nature of Agent Brown's actions.

We acknowledge that some aspects of the interrogation were not coercive. In Sharp, we noted that we should consider "whether the suspect was advised of his or

_____

[5] Agent Brown erroneously testified that the first interrogation occurred the day prior to his. The district court repeated this error. The first interrogation occurred on March 16, 2018, whereas Agent Brown's interrogation was on March 20.

[6] The government points out other differences between the interviews: it states that Young seemed more willing to confess at the beginning of the second interview, that Agent Brown developed a rapport with Young, and that Agent Brown confirmed that he had seen the dashboard camera video and offered to explain why the agents were asking about Young's possession of the container with 93 grams. But in our view, the key difference was Agent Brown's misrepresentations and promises of leniency.

her constitutional rights, the length of his or her detention, the nature of the questioning, and any physical punishment such as deprivation of food or sleep." 793 F.3d at 1233. None of these forms of coercion occurred in this case, and admittedly, several factors weigh against concluding the interrogation was coercive. The questioning was friendly and short: Young confessed within minutes of the beginning of the interrogation. Cf. Lopez, 437 F.3d at 1062, 1065 (implying interrogations lasting thirty minutes or one hour are short). Young was fully advised of his constitutional rights[7] and knew that he could stop the interrogation, as demonstrated by his stopping of the deputy's questioning four days earlier. And well into the interrogation, he asked the agents whether he should wait for his lawyer to be present and declined to consent to a search of his phone.

But these factors are not dispositive. Cf. United States v. Bustillos-Munoz, 235 F.3d 505, 517 n.8 (10th Cir. 2000) ("A suspect cannot be subjected to invalid coercion to obtain a confession just because he earlier was given a valid Miranda warning."). Our inquiry is based on the totality of the circumstances. Considering all of the evidence, we agree with the district court that Agent Brown's conduct was

---

[7] Notably, before the Miranda warning, the state narcotics agent elicited what could be construed as an incriminating statement. After Young was brought into the interrogation room but before he received a Miranda warning, Agent Brown left the room. Young asked the state officer if the agents were going to get him out of jail, and the officer responded that it would depend on Agent Brown. After a brief silence, the officer asked Young if he had anything else "going on," and Young responded that he had been "working selling dope." Because Young did not argue at the district court or on appeal that this pre-warning questioning contributed to the involuntariness of his confession, we do not consider it.

coercive in nature, particularly in light of his misrepresentation of the sentence Young faced, his false statement that he would speak to a federal judge about Young's cooperation, and his promises of leniency.

**B**

Because we agree that Agent Brown's conduct was coercive, we turn to Young's personal characteristics to answer the ultimate question:  whether Young's statements were voluntary.  See Lopez, 437 F.3d at 1064.  There is no evidence in the record to indicate that Young was "unusually susceptible to coercion because of age, lack of education, or intelligence."  Toles, 297 F.3d at 966 (quotation omitted).  Young was 43 years old and had completed a GED.  And nothing in the record suggests that he has limited intelligence.  See Lopez, 437 F.3d at 1060 (age and education did not weigh in favor of involuntariness for 33-year old defendant who finished eleventh grade); Toles, 297 F.3d at 966.

The district court correctly noted that Young had prior experience with the criminal justice system.  Although that is relevant to our analysis of voluntariness, see id., Young's prior experience was solely in the state system.  This prior experience did not necessarily make him less susceptible to believing promises of leniency and misrepresentations by a federal law enforcement officer explaining his access to a federal judge and how Young could "buy down" his sentence.  And Young was visibly shocked when Agent Brown told him he faced federal charges.

Young's personal characteristics are not dispositive, and they do not convince us that Young could withstand the coercion created by Agent Brown's legal

14

misrepresentations and promises of leniency.  See Lopez, 437 F.3d. at 1066

(concluding coerced confession was involuntary even though defendant's personal

characteristics did not suggest unusual susceptibility to coercion).  Under the totality

of the circumstances, we conclude that Young's capacity for self-determination was

critically impaired, rendering his confession involuntary.

## III

For the foregoing reasons, we **REVERSE** the decision of the district court,

**VACATE** the judgment entered against Young, and **REMAND** for proceedings

consistent with this decision.