FILED
United States Court of Appeals
Tenth Circuit

January 17, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

───────────────────────────

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ADALBERTO SANTOS PEREZ,

    Defendant - Appellant.

No. 24-3015

───────────────────────────

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 5:22-CR-40054-EFM-1)**

───────────────────────────

Adam M. Hall of Thompson-Hall, P.A., Lawrence, Kansas, for Defendant-Appellant.

James A. Brown, Assistant United States Attorney (Kate E. Brubacher, United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff-Appellee.

───────────────────────────

Before **HARTZ**, **TYMKOVICH**, and **PHILLIPS**, Circuit Judges.

───────────────────────────

**PHILLIPS**, Circuit Judge.

───────────────────────────

Adalberto Santos Perez appeals the district court's order denying his motions to suppress his incriminating statements and the contents of his cell phone. This case arises from the government's criminal prosecution of a drug-trafficking conspiracy operating in Kansas City. While investigating this

conspiracy, law enforcement identified Perez as a supplier of methamphetamine and fentanyl. After stopping a car and seizing three pounds of methamphetamine on its way to Perez, Drug Enforcement Administration (DEA) agents enlisted the driver to continue a methamphetamine shipment to Perez. The agents arrested Perez when he arrived to obtain the methamphetamine after it reached Kansas City. Then the agents tried to enlist Perez as a cooperator who could help extend the investigation to persons above Perez in the conspiracy. With Perez's permission, they interviewed him in custody for under an hour, during which Perez made some incriminating statements and consented to a search of his cell phone. But when Perez repeatedly insisted that he had not known about the three pounds of methamphetamine, the agents gave up on obtaining his cooperation and ended the interrogation. Perez later moved to suppress these statements and the contents of his cell phone. The district court denied suppression.

On appeal, Perez contends that the district court erred on three fronts. First, he argues that the district court should have suppressed his pre-*Miranda* response to an agent asking for the number to his seized cell phone. He claims the district court overstepped its role as a neutral arbiter by soliciting and using testimony from the agent in ruling that the statement was admissible under the inevitable-discovery doctrine. Second, he asserts that the district court should have suppressed his post-*Miranda* statements he made during his post-arrest interrogation. He claims that he did not voluntarily or knowingly waive his

2

*Miranda* rights and that even if he did, his statements were involuntary. Third, he argues that the district court should have suppressed the contents of his cell phone, because his multiple consents to search the phone were involuntary. We disagree with each contention. Exercising our jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm.

## BACKGROUND

### I. Factual Background

Perez managed an extensive drug-trafficking conspiracy operating in Kansas City. The investigation into the conspiracy gained steam after agents secured the cooperation of some of Perez's underling co-conspirators. For instance, from late 2021 to early 2022, DEA agents interviewed co-conspirators Nate Cisneros and Jacob Krainbill. Both stated that they had purchased kilogram-quantities of methamphetamine from Perez and identified him as their source of supply. Krainbill had also purchased between 5,000 and 10,000 fentanyl pills from Perez five times, and Cisneros saw packages of fentanyl near Perez while purchasing methamphetamine from him. They detailed their interactions with Perez, the quantities of drugs they bought from him, the number of drug transactions with him, and other identifying information about him. Both co-conspirators said that Perez resided in and operated out of Kansas City. These interviews centered Perez on DEA's radar screen.

In August 2022, Kansas Sheriff's Deputy Andrew Toolin stopped Oscar Tapia for a minor traffic violation. The stop grew more serious after a K-9 dog

3

alerted to the presence of controlled substances in Tapia's car. An ensuing search yielded three pounds of methamphetamine. After briefly questioning Tapia, Deputy Toolin contacted DEA Special Agent Justin Olberding and informed him that Tapia wanted to cooperate with the investigation.

Tapia identified a man he knew as "Beto" as the intended recipient of the methamphetamine. Agent Olberding recognized Beto as Perez from his earlier interviews with Cisneros and Krainbill. Tapia reported that Perez had offered $4,000 to transport the seized methamphetamine from Denver to Kansas City. He was en route to Kansas City when Deputy Toolin stopped him.

Tapia cooperated with Agent Olberding and other law enforcement officers by continuing the methamphetamine delivery to Perez. In doing so, Tapia called Perez to delay the delivery for a day, claiming he was having car trouble. Perez agreed to arrive at the new time and stated he may have a tow truck for Tapia's car. Law enforcement recorded Tapia's phone calls and text messages to Perez.

The next day, the DEA Special Response Team staged Tapia's car at a parking lot in Kansas City and placed a toolbox with three pounds of sham methamphetamine behind the driver's seat. Tapia in turn informed Perez of the car's location. At about 5 p.m., Perez arrived in his tow truck and approached Tapia's car. When he stepped to the passenger-side door, ten armed members of the DEA Team exited unmarked vehicles, announced their presence, and

ordered Perez to the ground.[1] Perez complied, lay face down on the pavement, and placed his hands behind his back. Agents detained him with zip-tie hand restraints.

Then the agents searched Perez incident to arrest and seized his cell phone. Agent Olberding soon arrived. Agents placed Perez in the passenger seat of a DEA vehicle. After a few minutes, Agent Olberding approached Perez and asked him for the number to Perez's cell phone. Perez gave the number and confirmed that he had spoken with Tapia using that number. Agent Olberding then left to confer with other law-enforcement personnel while Perez remained in the front passenger seat.

At about 5:22 p.m., Agent Olberding returned to Perez and read him a standard *Miranda* warning. Without having Perez acknowledge the *Miranda* warning, Agent Olberding recited information about Perez's involvement in the drug conspiracy. He first matched the phone number painted on Perez's tow truck to the number that Cisneros and Krainbill had used to purchase methamphetamine from Perez. Agent Olberding then summarized Perez's situation:

> We've got about fifteen to twenty pounds of meth on you right now
> . . . . I just got off the phone with my prosecutor. He told me I could
> take this as far as I want to go today, if I want to take it to where I
> want to go today, but if you don't want to talk to me, you don't want
> to do anything, I have his permission imma take you to jail in
> Topeka, you're gonna be in front of a magistrate judge tomorrow,

---

[1] The record doesn't reveal why the DEA Team arrested Perez before he gathered the sham methamphetamine from the toolbox inside Tapia's vehicle.

5

you're gonna be advised of your charges, you're looking at ten to life. So you're the person I'm looking at. I've cut a deal with two other people. So if you wanna help yourself, now is the time to do it.

Ex. 1 at 0:00:37–0:01:09.[2]

Agent Olberding demonstrated his familiarity with Perez by reciting Perez's "baby mama's" name and the names of Perez's customers, as well as recounting Perez's counter-surveillance driving techniques while delivering methamphetamine. He then repeated:

So again, I'm giving you one opportunity, it's gonna be right now, if you wanna help yourself out, we can do it. And we can go talk, and I can get you out of here, get you out of your cuffs, clear this shit up. No one else knows you're here. We can go talk in a controlled environment if you want to do that.

*Id.* at 0:01:48–0:02:02. The back and forth began with Perez's response, "So what do you want me to say?" *Id.* at 0:02:02–0:02:04.

Agent Olberding next returned to reciting evidence that implicated Perez. Despite that, Perez maintained that he had arrived at the parking lot only to tow Tapia's car. Agent Olberding retorted:

You can question all the evidence I got. So you're gonna get this all provided to you in discovery. It's all gonna be in a nice neat little packet that's gonna say DEA on it. And you're gonna be in those cuffs. And you're going to be in an orange jumpsuit, with the U.S. Marshal transporting you in, with your attorney sitting beside you at a table telling you: "you either talk now or—"

---

[2] The parties submitted three audio recordings as volume II of the record. The audio recordings consist of Perez's August 22, 2022 arrest (Exhibit 1), transport (Exhibit 2), and interrogation at the Kansas Highway Patrol building (Exhibit 3). We cite the recordings by exhibit number.

*Id.* at 0:02:57–0:03:15. Perez interrupted Agent Olberding and again asked, "So what do you want me to tell you?" *Id.* at 0:03:15–0:03:17. Agent Olberding continued his recitation of knowledge from the investigation, including listing cooperators' names, describing the conduct of the cooperators, and stating that "there's a reason" each cooperator was "not in jail." *Id.* at 0:03:34–0:03:42. Along this line, Agent Olberding commented, "But if you want a chance to help yourself, we'll throw you in, we'll go talk to you in a controlled environment, and we'll lay it all out." *Id.* at 0:04:03–0:04:08. At that point, Perez agreed to go with Agent Olberding to the controlled environment. *Id.* at 0:04:08–0:04:10.

So Agent Olberding drove Perez and another task force officer to a Kansas Highway Patrol building. During the drive, Agent Olberding described the categories of information that he sought. And he set the stage for the upcoming interrogation:

> If I ask a question more than likely I'm probably gonna know the answer. Alright? If I catch you lying to me, like I said I've got an AUSA—you don't know what an AUSA is—but it's an Assistant United States Attorney, already on the phone that told me I can take you to jail and put you in federal custody. And I'm telling you the weight that we have for federal custody.

Ex. 2 at 0:01:26–0:01:50. Agent Olberding asked about Perez's prior addresses, vehicles, and personal finances. At certain points, Agent Olberding demonstrated his knowledge of Perez's background. He confronted Perez about his initially giving a false address and stated the name of the cosigner and bank

7

that had financed Perez's Chevy Trail Boss purchase. He told Perez, "Like I said, if I ask you a question, I know the answer." *Id.* at 0:06:16–0:06:20.

After they arrived at the Patrol building, Agent Olberding resumed the interrogation. He began by stating, "You can corroborate what you did with them, you can help yourself out. If you don't wanna help yourself out, I don't wanna waste my time." Ex. 3 at 0:00:59–0:01:06. Agent Olberding then showed Perez photos of suspected co-conspirators and asked what Perez did with each one. He also asked how much methamphetamine Perez had sold to them. Perez identified some people in a few photos. Agent Olberding remarked that Perez's "girl" planned to pick up "dope" in California that week; when Perez denied this information, Agent Olberding responded, "Bullshit." *Id.* at 0:04:10– 0:04:30.

At one point, Perez expressed shock when Agent Olberding stated that law enforcement had tied him to the six pounds of methamphetamine and one pound of fentanyl seized from Cisneros. Perez disputed the quantities, stating, "I don't have that much." *Id.* at 0:04:37–0:04:46. Agent Olberding responded, "You don't right now. You did, you did," and then stated, "How much do you do? Humor me." *Id.* at 0:04:43–0:04:47. Perez admitted having sold four ounces of methamphetamine but denied even having access to the quantities of methamphetamine that Agent Olberding was attributing to him.

When Agent Olberding mentioned Tapia, Perez denied having anything to do with Tapia. He stated that he had driven to the parking lot only after Tapia

8

called for a tow truck. And when Agent Olberding scoffed at this response, Perez volunteered, "Look, look it up." *Id.* at 0:05:01–0:05:05. Agent Olberding then clarified by asking, "I can look at your phone?" and Perez responded, "Yeah." *Id.* at 0:05:05–0:05:08. As Perez continued claiming that he had arrived only to tow Tapia's car, Agent Olberding challenged Perez's account, stating that the earlier-monitored messages from Tapia to Perez's phone said otherwise. Agent Olberding also embellished his knowledge of a meeting between Perez and Tapia at a bar by saying that law enforcement had "surveilled" that meeting. Perez denied this meeting. Agent Olberding again confirmed, "I can look at your phone?" and Perez responded, "Yeah, I don't have nothing to hide, bud." *Id.* at 0:05:44–0:05:48.

So Agent Olberding spent a few moments looking through Perez's phone. Perez still maintained that he had arrived merely to tow Tapia's car. To that, Agent Olberding responded, "If that's the story that we're gonna stick with, I got no use for you." *Id.* at 0:07:07–0:07:10. He told Perez, "I'm not a state guy," "I'm not a local guy," and, "This isn't my first rodeo." *Id.* at 0:07:10–0:07:20. He explained that he had begun investigating Perez even before arresting his co-conspirators. Agent Olberding stated that Perez came to law enforcement's attention after agents saw that the mother of Perez's son had always sold dope soon after Perez visited her. He then told Perez how law enforcement had identified him, his photo, and his pick-up truck.

9

After sharing this information from the investigation, Agent Olberding told Perez not to waste his time by admitting having sold just four ounces of methamphetamine. He told Perez that he wanted Perez's admission to pound-quantities of methamphetamine and stated, "I have people like you that help me out cuz they don't want to go to prison for ten years." *Id.* at 0:10:34–0:10:50. Then Agent Olberding asked about Perez's children and their ages, and he reviewed Perez's likely statutory sentencing range:

> I'm telling you what you're looking at. Ten to life, ten to life, and I could hit you with importation that's gonna be an enhancement because the shit that you get comes straight from Mexico. So people like you make my career a lot easier when I can get you on Team America.

*Id.* at 0:11:25–0:11:45. Agent Olberding again named some of Perez's co-conspirators and stated that they're either "locked up" or "bought and paid for." *Id.* at 0:11:46–0:12:05. He spelled out that if Perez could not "help" him, he would "put the cuffs back on," "transport [Perez] back to Topeka," and "put [Perez] in front of a judge tomorrow." *Id.* at 0:12:11–0:12:18. He claimed that the judge would advise him of a sentencing range of ten years to life and up to a $1,000,000 fine. *Id.* at 0:12:18–0:12:23. Agent Olberding summed it up this way:

> My case is fucking rock solid. You'll be locked up at least ten years. You'll get an attorney. Your attorney will get discovery . . . . Your attorney will look at it and be like, "This is the only way you'll get cooperation on the federal side. It's the only way you'll get any kind of sentence reduction is cooperation." That's talking to me, helping me out. And acceptance of responsibility. Acceptance of responsibility is "I'm not gonna talk to them, but I am going to plead

guilty and I am gonna go away to prison." That's it, those are the only two avenues you got. Cooperation six months from now doesn't carry the weight cooperation does today.

*Id.* at 0:12:30–0:13:09. He also warned Perez that his co-conspirators' conduct may count as Perez's relevant conduct at sentencing.

At this point, Perez made two more incriminating statements: (1) that he twice sold about a pound of methamphetamine to Cisneros, and (2) that he twice sold drugs to Krainbill. *Id.* at 0:14:18–0:15:55. But Perez still denied knowing about the methamphetamine in Tapia's car and insisted that he had come only to tow Tapia's car. *Id.* at 0:19:06–0:19:51. Perez again confirmed that Agent Olberding had permission to view the contents of his cell phone. Agent Olberding told Perez that his "half-truths" and admissions were not enough. *Id.* at 0:23:07–0:23:16. Then Agent Olberding tried one more time:

> If this is all I get out of this interview, you will go to jail today. But if you will help me out and help me do something, I will call my AUSA in a heartbeat . . . I'm asking you to try to help me out. I've had people in your situation that have completely got a walk before, no charges, nothing . . . . I've put some people in jail, but if you can help me get to step C, B, and A, I don't have to charge you. You're in the best position that you are right now. And that's why I give this opportunity to talk.

*Id.* at 0:25:00–0:26:15. Soon after, Agent Olberding remarked,

> I've got like three more minutes. If this is all we're getting, we're done . . . . I'm going to take you to jail, and I'm having him call the Marshals to see where they want you housed . . . This is where the rubber meets the road. I got about three more minutes, I'm gonna transport you back either to Topeka or Jackson County, Kansas, which is an hour and a half from here. Unless you give me something that I can do with.

11

*Id.* at 0:34:04–0:34:59. Despite Agent Olberding's efforts, Perez made no further admissions. The interrogation ended with law enforcement transporting Perez to a detention facility and the government filing a criminal complaint the next day for drug crimes carrying a statutory sentencing range of ten years to life imprisonment.

## II.    Procedural History

A week after Perez's arrest, a federal grand jury returned a two-count indictment against Perez.[3] Count One charged him with conspiracy to distribute and possess with the intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2. Count Two charged him with possession with the intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2. These charges carried a sentence of ten years to life imprisonment.

Perez moved to suppress statements he made both before and after Agent Olberding read him the *Miranda* warning, as well as the contents of his cell phone. Perez argued that he gave his cell-phone number before receiving a *Miranda* warning and that he did not knowingly and voluntarily waive his

---

[3] This indictment also charged Tapia with the same offenses. The government charged Cisneros and Krainbill in two separate cases. *See* Superseding Indictment, *United States v. Cisneros*, No. 5:21-CR-40104-TC (D. Kan. Jan. 5, 2022), ECF No. 11; Indictment, *United States v. Krainbill*, No. 5:21-CR-40082-TC (D. Kan. Aug. 26, 2021), ECF No. 16.

*Miranda* rights for statements he made after he received the warning. He also asserted that even without a *Miranda* violation, Agent Olberding's "intimidating, coercive, and deceptive manner of interrogation" rendered his statements involuntary.[4] R. vol. I, at 28. Perez claimed that these same conditions rendered his consent to the phone search invalid as well (not addressing that he had invited Agent Olberding to view the contents of his cell phone before even being asked for his consent to do so).

The district court held an evidentiary hearing on the suppression motions.[5] Agent Olberding testified at the hearing about some portions of Perez's interrogation. For instance, Agent Olberding explained what he meant when he said that he (Agent Olberding) "could take this [interrogation] as far as [he] wanted to go today" and that Perez could be "in front of a magistrate judge tomorrow." Ex. 1 at 0:00:44–0:00:49, 0:00:56–0:00:58. He testified that agents make the initial arrest decision, that he had communicated with the prosecutor before the arrest, and that he and the prosecutor would discuss what to do with Perez depending on what Perez "provided [them]." R. vol. I, at 187–88. Agent Olberding also admitted that agents had not *surveilled* Tapia and Perez at the bar. Agent Olberding acknowledged that he had told Perez what

---

[4] During oral argument, two panelists asked at what point in the interrogation Perez's responses became involuntary, but defense counsel did not pinpoint a time. Oral Argument at 0:04:28–0:06:25.

[5] Perez filed two separate motions to suppress—one to suppress his statements and the other to suppress the contents of his cell phone.

Perez's lawyer would tell him once charged—that "the only way [he]'ll get any kind of sentence reduction is cooperation." Ex. 3 at 0:12:37–0:12:52. At the hearing, Agent Olberding described this as his just trying to "relate to" Perez that "most people" cooperate to "try to mitigate some of the charges that [they] could face." R. vol. I, at 181.

The district court denied Perez's suppression motions. *United States v. Perez*, No. 5:22-CR-40054-EFM-1, 2023 WL 1992721, at *1 (D. Kan. Feb. 14, 2023). First, the district court declined to suppress Perez's pre-*Miranda* statement revealing his phone number. *Id.* at *4. The court relied on the inevitable-discovery doctrine after crediting Agent Olberding's testimony that he would have learned the cell-phone number by calling the phone number that Tapia had called to speak to Perez. *Id.*

Second, the district court denied Perez's request to suppress his post-*Miranda* statements. *Id.* at *6. Perez acknowledged that he never invoked his *Miranda* rights but argued the government had not established that he "knowingly and voluntarily waived [his] *Miranda* rights." *Id.* at *4–5 (cleaned up). The district court concluded otherwise. *Id.* at *6. And the court rejected Perez's claims that Agent Olberding had made misrepresentations during the interrogation that had overborne Perez's will. *Id.* at *5. As for Perez's potential penalties, the district court found that Agent Olberding's stated penalties in fact matched the penalties for the charged crimes. *Id.* It further determined that Agent Olberding's statement about having "15 to 20 pounds of meth" on Perez

14

did not misrepresent the strength of the evidence but merely "inform[ed] Perez of the amount of methamphetamine that DEA agents had recovered at that time that they believed could be tied back to Perez." *Id.* Finally, the district court concluded that Agent Olberding did not misrepresent any potential for leniency, because a prosecutor had given Agent Olberding "discretion" over how to handle Perez. *Id.* The court determined that the totality of the circumstances weighed against a coerced confession. *Id.* at \*5–6.

Third, because the district court concluded that law enforcement did not use coercive or deceptive tactics during the interrogation, it reasoned that Perez had validly consented to the cell-phone search.[6] *Id.* at \*6. For these reasons, the district court denied Perez's motions to suppress. *Id.*

Later, the government filed a superseding information reducing Perez's charges to one count of conspiring to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2. Perez entered a conditional guilty plea, which reserved his right to appeal the district court's denial of suppression. The district court sentenced Perez to a mid-range term of 225 months' imprisonment. Perez timely appealed the order denying suppression.

---

[6] The district court did not mention that Perez himself was the one who raised the possibility of searching the cell phone by *volunteering* to Agent Olberding that he should do so to see that Perez was not connected to Tapia. Ex. 3 at 0:05:01–0:05:05 ("Look. Look it up."), 0:05:44–0:05:48 ("I don't have nothing to hide, bud.").

**STANDARD OF REVIEW**

"When reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government and accept the district court's factual findings unless they are clearly erroneous." *United States v. Palms*, 21 F.4th 689, 697 (10th Cir. 2021) (internal quotation marks omitted). We review de novo any legal conclusions. *United States v. Young*, 964 F.3d 938, 942 (10th Cir. 2020).

**DISCUSSION**

On appeal, Perez again challenges the admissibility of the same three categories of incriminating evidence. First, Perez argues that the district court improperly admitted evidence of his cell-phone number, which he gave to Agent Olberding before receiving a *Miranda* warning. Second, Perez asserts that the district court erred by admitting his statements made after receiving a *Miranda* warning. He claims his *Miranda* waiver was not knowing and voluntary and, in addition, that his statements were coerced and involuntary. And third, Perez argues that none of his consents to the search of his cell phone were voluntary. We consider each category of statements in turn.

**I.    Pre-*Miranda* Cell-Phone Statement**

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To secure this privilege against self-incrimination, the Supreme Court prohibits the admission of statements obtained during a custodial

16

interrogation without providing required procedural safeguards. *See Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). Here, Agent Olberding gave no *Miranda* warning to Perez before asking for and receiving his cell-phone number. In the district court, the government did not dispute that during this interaction, Perez was in custody and interrogated. So the government conceded a *Miranda* violation. *Perez*, 2023 WL 1992721, at *3.

Despite this violation, the government argued that the inevitable-discovery doctrine overcame the *Miranda* violation. It reasoned that law enforcement had legally seized the phone by a search incident to arrest and had probable cause to obtain a search warrant that would disclose the phone's number.[7] *Id.* at *4. The district court correctly rejected this argument. *Id.* It ruled that "'the inevitable discovery exception does not apply in situations where the government's only argument is that it had probable cause for the search' without having 'taken steps in an attempt to obtain a search warrant.'" *Id.* (quoting *United States v. Souza*, 223 F.3d 1197, 1203 (10th Cir. 2000)).

But the district court applied another rationale for the inevitable-discovery doctrine after this colloquy with Agent Olberding:

| The Court: | Have you ever, with respect to just discovering the number of a phone that you have in your possession |
|---|---|

---

[7] The inevitable-discovery doctrine provides that "unlawfully obtained evidence may be admitted at trial if an independent, lawful police investigation inevitably would have discovered it." *United States v. Owens*, 782 F.2d 146, 152 (10th Cir. 1986).

that you think you have the number, simply dialed that number to see if it rings?

Agent Olberding:    Multiple times, yes, sir.

The Court:    And you don't need a warrant to do that.

Agent Olberding:    No, sir. And in this instance, had he not provided me that phone number, I would have called the phone number that Mr. Ibarra Tapia was communicating with. I can say that 20/20 vision. But in hindsight, had he not provided me that number, had he not provided me consent later on to look at the phone with him, I would have called the number to verify that is the number, even prior to applying for and receiving—or applying for a federal search warrant.

R. vol. I, at 199–200. Based on Agent Olberding's answers, the district court ruled that Agent Olberding would have inevitably discovered Perez's cell-phone number and admitted Perez's pre-*Miranda* statement. *Perez*, 2023 WL 1992721, at *4.

On appeal, Perez objects to the scope of the district court's questioning and its fashioning of an inevitable-discovery theory that enabled it to rule for the government. He does not challenge the district court's legal reasoning on the inevitable-discovery doctrine but instead argues that the district court overstepped its role as a neutral arbiter. Specifically, Perez contends that the district court erred by (1) questioning Agent Olberding at the suppression hearing on whether the agent had dialed suspected phone numbers in past investigations, and then (2) using that portion of Agent Olberding's testimony to apply the inevitable-discovery exception here. We review each argument below.

### A.    Perez has waived his objection to the district court's judicial examination at the suppression hearing.

Relying on Federal Rule of Evidence 614, Perez first argues that the district court "exceeded the normal bounds of a judicial examination" by questioning Agent Olberding about any prior practice of calling suspected phone numbers. Op. Br. at 18. The government counters that Perez forfeited this argument by failing to object to the district court's questions at the suppression hearing and then waived it by failing to argue plain error in his opening brief. We agree that Perez failed to preserve this issue in the district court and has waived it on appeal. *See United States v. Leffler*, 942 F.3d 1192, 1199–1200 (10th Cir. 2019). We have "discretion to consider a plain-error argument raised for the first time in a reply brief" but "are not required to do so." *Id.* at 1200. Perez raises no good reason for us to exercise our discretion, and we discern none. For these reasons, we consider Perez's argument waived on appeal.[8]

---

[8] Federal Rule of Evidence 614 permits a court to "question witnesses called by the parties," so long as the court does not "become an advocate for either party." *United States v. Orr*, 68 F.3d 1247, 1250 (10th Cir. 1995). And though the Federal Rules of Evidence generally do not apply to suppression hearings, that inapplicability suggests even greater freedom for the district court to examine a witness outside the Rules' confines. *See United States v. Matlock*, 415 U.S. 164, 173–74 (1974). Under these circumstances, even if we exercised our discretion to review Perez's claim under the plain-error standard, we fail to see how the district court's questions exceeded the bounds of permissible judicial examination. The district court properly exercised its role as a factfinder at the suppression hearing, and none of its questions improperly advocated for the government's position. *Orr*, 68 F.3d at 1250.

We also note that this issue of waiver raises an unbriefed question of whether Federal Rule of Criminal Procedure 12(b)(3)(C) should apply to our review of Perez's unpreserved argument on appeal, instead of Rule 52. *United States v. Burke*, 633 F.3d 984, 991 (10th Cir. 2011) ("Rule 12's waiver provision . . . governs motions to suppress evidence, including specific arguments to suppress evidence, raised for the first time on appeal."). But even if Rule 12(b)(3)(C) applied, we would still deem the argument waived, because Perez has not shown good cause for failing to object to the judicial examination before the district court. Fed. R. Crim. P. 12(c)(3) (requiring a party to show good cause for an untimely motion); *see also United States v. Augustine*, 742 F.3d 1258, 1266 (10th Cir. 2014) (holding that an attorney's failure to make an argument in a suppression hearing does not qualify as good cause); *United States v. Vance*, 893 F.3d 763, 770 (10th Cir. 2018) (noting that the defendant never objected to the government's altered position at the suppression hearing). No matter if Rule 12 or Rule 52 applies to this unpreserved argument, the result is the same—the argument is waived. Because the parties have not briefed the application of Rule 12(b)(3)(C), we leave that issue for another day.

B.    **The district court did not exceed its role by developing an independent basis with which to apply the inevitable-discovery doctrine.**

Relatedly, Perez argues that the district court overstepped its role as a neutral arbiter by developing its own basis for applying the inevitable-discovery doctrine. As mentioned, the district court ruled that the inevitable-

20

discovery doctrine applied to Perez's cell-phone number. The district court relied on Agent Olberding's testimony that he would have simply called the telephone number that Tapia had called for Perez and waited for Perez's seized cell phone to ring. *Perez*, 2023 WL 1992721, at *4. This ruling went beyond the government's argument that the inevitable-discovery doctrine applied because the agent had probable cause to obtain a search warrant for the phone. *Id.* So Perez contends that the district court improperly advocated for the government by adopting an independent reason for inevitable discovery.

Before examining the merits, we note that Perez did not forfeit this argument. Until the district court's order, neither the parties nor the court had raised the inevitable-discovery doctrine based on Agent Olberding's ability to learn Perez's cell-phone number by dialing it. Because Perez had no earlier opportunity to challenge the district court's reasoning and conclusion, he did not forfeit this argument. *See United States v. Pena*, 115 F.4th 1254, 1259 n.1 (10th Cir. 2024) ("Because Defendant could not have challenged the district court's factfinding until after the district court made the finding, Defendant did not waive the purported factfinding error by failing to raise it prior to the district court's ruling."). We now review whether the district court exceeded its role by adopting an independent basis for the inevitable-discovery exception.

Our adversarial system "follow[s] the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). "[I]n both civil and criminal cases, in the first instance and on appeal . . . , we rely on the parties to

21

frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). At the same time, the "party presentation principle is supple, not ironclad," and there are "no doubt circumstances in which a modest initiating role for a court is appropriate." *Sineneng-Smith*, 590 U.S. at 376. "When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). We have clarified that the party-presentation principle "restricts courts from *raising* new issues." *United States v. Cortez-Nieto*, 43 F.4th 1034, 1052 (10th Cir. 2022). But if the parties have raised and responded to an issue, this principle does not require a court to "render its decision in accordance with the position of one of the parties." *Id.*

In the district court, Perez moved to suppress his pre-*Miranda* statement, and the government countered with the inevitable-discovery doctrine. The government argued in its briefing that the inevitable-discovery doctrine applied "because law enforcement already had the phone pursuant to a valid search incident to arrest and that probable cause existed such that officers could have obtained a search warrant." *Perez*, 2023 WL 1992721, at *4. As support for its argument, the government contended that the agents "already had the cell phone telephone number and were texting to it" and seized the cell phone from Perez

incident to his lawful arrest. R. vol. I, at 71–72. Perez in turn had the opportunity to respond—and did respond—to the government's inevitable-discovery argument.

Under these circumstances, the district court's application of the inevitable-discovery doctrine falls within the "modest initiating role" that courts may assume without violating the party-presentation principle. *Sineneng-Smith*, 590 U.S. at 376. The parties raised and responded to the inevitable-discovery issue and even provided some of the facts that supported the district court's alternative basis for inevitable discovery. *See Cortez-Nieto*, 43 F.4th at 1052 (finding no violation of the party-presentation principle when a court rules on a properly raised issue but does not "render its decision in accordance with the position of one of the parties"). The district court's conclusion that the inevitable-discovery doctrine applies for a different reason from the government's does not violate the party-presentation principle.[9]

---

[9] Perez does not otherwise challenge the reasoning in support of inevitable discovery, so we decline to disturb the district court's conclusion that inevitable discovery applies to Perez's pre-*Miranda* statement.

Alternatively, the district court ruled that under *Oregon v. Elstad*, 470 U.S. 298 (1985), the "subsequent administration of *Miranda* warnings" sufficed to remove any illegality from obtaining the pre-*Miranda* statement. *Perez*, 2023 WL 1992721, at *4 & n.9 (internal quotation marks omitted). On appeal, the parties agree that the district court erred by admitting the pre-*Miranda* statement under *Elstad*. We agree with this assessment. But because inevitable discovery provides the necessary basis for admission, this error does not affect the outcome.

## II.    Post-*Miranda* Statements

Perez next challenges the district court's decision to admit statements that he made after receiving a *Miranda* warning. He argues two independent grounds: (1) that he did not knowingly and voluntarily waive his *Miranda* rights, and (2) that his statements to Agent Olberding were coerced and therefore involuntary. We take each argument in turn.

### A.    Perez voluntarily and knowingly waived his *Miranda* rights.

As discussed above, *Miranda* prohibits the admission of statements obtained during a custodial interrogation without a prerequisite warning of the individual's rights. *Miranda*, 384 U.S. at 479. The parties agree that Agent Olberding orally communicated a standard *Miranda* warning to Perez before the statements at issue. After receiving the *Miranda* warning, Perez never expressly invoked his right to remain silent. *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (stating that failure to expressly invoke the right to remain silent does not automatically equate to a *Miranda* waiver). He now argues that he did not voluntarily and knowingly waive his right to remain silent.

"[*Miranda*] waivers can be established even absent formal or express statements of waiver[.]" *Id.* at 383. To determine whether Perez properly waived his *Miranda* rights, we must evaluate "two distinct dimensions" of the waiver—its voluntariness and knowingness. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or

24

deception." *Id.* Second, the waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (internal quotation marks omitted). The government bears the burden of showing by a preponderance of the evidence that the defendant voluntarily and knowingly waived his *Miranda* rights. *Berghuis*, 560 U.S. at 383–84.

### 1.     Voluntary Waiver

First, Perez contends that he did not voluntarily waive his *Miranda* rights. To determine whether a defendant's waiver was voluntary, we consider these factors: "[1] the suspect's age, intelligence, and education; [2] whether the suspect was informed of his or her rights; [3] the length and nature of the suspect's detention and interrogation; and [4] the use or threat of physical force against the suspect." *United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010). The question of voluntariness ultimately turns on "whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." *United States v. Rith*, 164 F.3d 1323, 1333 (10th Cir. 1999).

The district court analyzed the above factors and found a voluntary waiver. *Perez*, 2023 WL 1992721, at *6. We agree. For the first factor, "Perez

at the time was a 33-year-old, U.S. Citizen with a GED with no history of mental health or substance abuse treatment[.]" *Id.* These personal characteristics assure us that Perez comprehended the significance of waiving his *Miranda* rights. Second, Agent Olberding provided a *Miranda* warning to Perez. *Id.* This factor supports a voluntary-waiver determination. Third, Perez agreed to be interrogated, and Agent Olberding ended their interaction after less than two hours. Perez was detained for about twenty-two minutes before the interrogation and interrogated for under an hour.[10] *Id.* This relatively short period favors a voluntary waiver. *Pena*, 115 F.4th at 1262 (stating that an interrogation lasting nearly four hours suggests a voluntary confession). Fourth, law enforcement never used or threatened physical force against Perez. *Perez*, 2023 WL 1992721, at *6. These factors establish that Perez voluntarily waived his *Miranda* rights.

On appeal, Perez argues that Agent Olberding coerced him to waive his *Miranda* rights by creating a "Hobson's choice" or "false dilemma." Op. Br. at 21. According to Perez, Agent Olberding improperly presented two options: "(1) maintain silence, go to jail immediately, and get locked up at least 10 years, or (2) waive silence and help himself out, get the cuffs off, and pursue the only way to get any kind of sentence reduction, by cooperating." *Id.* (cleaned up). This argument repackages two of Perez's arguments before the

---

[10] The parties do not dispute the length of the detention and interrogation. *Perez*, 2023 WL 1992721, at *6.

district court. *See Perez*, 2023 WL 1992721, at *5. There, Perez argued that

Agent Olberding misrepresented Perez's penalties and the potential for

leniency. *Id.* The district court rejected these arguments after finding that

Agent Olberding's statements accurately reflected the penalties and potential

for leniency given his charged crimes. *Id.* On appeal, Perez's "Hobson's

choice" argument fails for the same reason. The two options are not a "false"

dilemma; they represent an actual dilemma that Perez had to face based on the

known evidence of his guilt.

Starting with Agent Olberding's comments about facing "ten to life," we

agree with the district court's conclusion that these comments correctly

described the statutory penalty Perez faced for his upcoming charges. *Id.* at *5.

We have stated that if an agent misrepresents a suspect's penalties, "then that

deception affects our evaluation of the voluntariness of any resulting

statements."[11] *Young*, 964 F.3d at 944. But the agent here did not misrepresent

Perez's potential penalties. Perez was charged with two drug-trafficking counts

that each carried an imprisonment range of ten years to life. Agent Olberding's

---

[11] In *Young*, we considered the agent's misrepresentations in the context of an involuntary confession, rather than an involuntary *Miranda* waiver. 964 F.3d at 945–46. Though an involuntary confession is distinct from an involuntary *Miranda* waiver, an agent's misrepresentation may also affect the voluntariness of a defendant's *Miranda* waiver. *See United States v. Cash*, 733 F.3d 1264, 1280 n.12 (10th Cir. 2013) ("[R]egardless of whether we evaluate the voluntariness of a statement through the lens of *Miranda* waiver, the privilege against self-incrimination, or the Due Process Clause, our inquiry is the same—we consider the totality of the circumstances.").

comments reflected that reality. His comments about "go[ing] to jail immediately" also accurately described Perez's situation. Op. Br. at 21. Agent Olberding had probable cause to arrest Perez for drug trafficking based on the interviews with various co-conspirators, the text messages between Tapia and Perez, and Perez's appearance at Tapia's car for the three pounds of methamphetamine. In fact, Perez's failure to cooperate resulted in the exact situation that Agent Olberding warned of: Perez was arrested and detained pending trial.

Perez's complaints about the other option—cooperation—suffer the same defect. Again, Agent Olberding's comments did not misrepresent Perez's situation. At the suppression hearing, Agent Olberding testified that "if [Perez] had cooperated," Agent Olberding could have "let him go pending further cooperation in the future" after speaking with the prosecutor. R. vol. I, at 166–67. Agent Olberding's statement that he needed immediate cooperation also reflected the importance of accurate and timely information. And Agent Olberding's comments about cooperation as the "only way" for Perez to receive a sentence reduction were accurate as well.[12] Perez offers no other avenue for a sentence reduction, and we discern none. Agent Olberding's statements therefore do not amount to misrepresentation. Instead, his statements merely

---

[12] Perez's role as a manager in the drug conspiracy disqualified him from the statutory safety valve, which might otherwise have allowed the district court to disregard the ten-year mandatory minimum.

informed Perez of the potential consequences of silence versus cooperation. For these reasons, Perez's false-dilemma argument fails.[13] We conclude that Perez voluntarily waived his *Miranda* rights.

### 2. Knowing Waiver

Next, Perez asserts that he did not knowingly waive his *Miranda* rights. He contends that Agent Olberding's interrogation "undermined" his awareness of the "consequences of the decision to abandon his right to silence." Op. Br. at 22 (internal quotation marks omitted). To make a knowing *Miranda* waiver, the defendant must have "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. "[W]hen a defendant is read his *Miranda* rights . . . and agrees to waive those rights, that typically does the trick." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). Nothing suggests that Perez did not understand the *Miranda* warning.

In fact, the opposite was true. Perez approached the interrogation as a negotiation. Nothing about his age, education level, or mental ability hindered him. Testing the limits, Perez at multiple times responded to Agent Olberding's requests for cooperation by asking, "So what do you want me to say?" Ex. 1 at 0:02:02–0:02:04; *see also id.* at 0:03:15–0:03:17. Rather than fully confess,

---

[13] Perez argues that Agent Olberding's statements qualified as promises of leniency, so as to render his *Miranda* waiver involuntary. Because Perez also argues that the promises of leniency resulted in an involuntary confession, we evaluate these arguments together in Section II.B.

Perez probed for the minimum morsels that would satisfy Agent Olberding and gain the sought-after leniency. Perez's responses show that he was aware of the rights he chose to waive and did so while trying to make the best deal he could with the evidence of guilt hovering over him. Rather than a cowed defendant being pushed around by the agent, we see Perez holding his own in the negotiation and comfortable enough to speak to the agent as "bud." Ultimately, when Perez's limited admissions weren't enough, the agent gave up on obtaining Perez's cooperation.

Perez nevertheless argues that three circumstances counsel against a knowing waiver: (1) that Agent Olberding improperly presented a false dilemma to Perez, (2) that Agent Olberding failed to ensure that Perez understood the *Miranda* warning or to seek an express waiver from Perez, and (3) that Agent Olberding improperly speculated about what Perez's future attorney would advise Perez after being appointed. The recycled false-dilemma argument fails for the same reasons discussed above. We now turn to the remaining two arguments.

First, Perez notes that Agent Olberding did not pause after giving the *Miranda* warning before discussing the specifics of the case and questioning him. And Perez never expressly waived his *Miranda* rights. But these circumstances alone do not automatically result in an unknowing waiver. "An implicit waiver of the right to remain silent is sufficient to admit a suspect's statement into evidence." *Berghuis*, 560 U.S. at 384 (internal quotation marks

omitted). A defendant may implicitly waive his *Miranda* rights through his "silence [on waiver], coupled with an understanding of his rights and a course of conduct indicating waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

In *Berghuis*, the Supreme Court considered whether a defendant, who had been silent for most of his three-hour interrogation, waived his right to remain silent when he started answering an officer's questions. *Berghuis*, 560 U.S. at 375–76, 384. Before the interrogation, officers read a valid *Miranda* warning to him. *Id.* at 374–75. He declined to sign the waiver form, and it was unclear if the defendant orally confirmed his understanding. *Id.* at 375. But the Court considered that the defendant had received a written copy of the *Miranda* warning, could read and understand English, was given time to read the warning, and received an oral warning. *Id.* at 385–86. In that context, the Court found that the defendant had received and understood the *Miranda* warning, meaning he waived his right to remain silent by making an uncoerced statement to the police. *Id.* at 385–89.

Perez's course of conduct provides an even stronger case for waiver than presented in *Berghuis*. Perez made an uncoerced statement less than a minute after receiving the *Miranda* warning.[14] Ex. 1 at 0:01:20. He actively participated in the interrogation at many points and even agreed to go to a

---

[14] In the next section, we explain why Perez's statements were not coerced.

controlled environment with Agent Olberding for questioning. Perez answered questions about his relationships, his vehicle, his personal finances, and his prior drug dealing. And as discussed above, his personal circumstances support a knowing waiver. Based on Perez's course of conduct and understanding of the *Miranda* warning, we conclude that Perez implicitly waived his *Miranda* rights and that his lack of an express waiver does not equate to an unknowing waiver. *Butler*, 441 U.S. at 373.

Second, Perez claims that Agent Olberding's opining about the likely advice of Perez's future attorney undermined a knowing waiver. He argues that Agent Olberding's "legal advice" created the erroneous impression that Perez did not need a lawyer. This argument fails. By the time Agent Olberding began discussing potential legal advice from Perez's hypothetical lawyer, Perez had already waived his *Miranda* rights by responding to Agent Olberding's questions. This hypothetical-lawyer tactic therefore had no effect on Perez's *Miranda* waiver. *Cf. Colorado v. Connelly*, 479 U.S. 157, 170 (1986) ("*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that."). Perez's arguments fail to undermine his knowing *Miranda* waiver.

For these reasons, we conclude that, under the totality of the circumstances, Perez voluntarily and knowingly waived his *Miranda* rights.

32

**B.    Perez voluntarily made incriminating statements.**

Perez also argues that his statements to Agent Olberding "were coerced and, therefore, involuntary." Op. Br. at 24. "The government's use of an involuntary confession as evidence in a criminal trial violates a defendant's Fifth Amendment right against self-incrimination." *Pena*, 115 F.4th at 1260. We evaluate whether a confession is voluntary based on the totality of the circumstances. *Id.* at 1261. The government bears the burden of proving, by a preponderance of the evidence, that a confession is voluntary. *Id.* "[O]ur precedent recognizes that the following often inform our judgment: (1) the Defendant's age, intelligence, and education; (2) the detention's length; (3) the questioning's length and nature; (4) whether law enforcement advised Defendant of his constitutional rights; and (5) whether law enforcement subjected Defendant to physical punishment." *Id.* These factors are identical to the factors we consider when evaluating an allegedly involuntary *Miranda* waiver. The overarching question is whether "law enforcement overbore the defendant's free will and critically impaired the defendant's 'capacity for self-determination.'" *Id.* (quoting *United States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993)).

The district court rejected Perez's argument. *Perez*, 2023 WL 1992721, at *6. It considered the totality of the circumstances, including Perez's personal characteristics of age, education level, and medical history; the provided *Miranda* warning; the length of detention; and the lack of physical force, to

33

conclude that Perez voluntarily made his incriminating statements. *Id.* After considering those factors, the district court determined that Agent Olberding had made a promise of leniency but that the agent's statements about sentencing did not undermine the voluntary nature of Perez's statements. *Id.*

We agree with the district court's conclusion. Our prior analysis of the totality of the circumstances for a voluntary *Miranda* waiver applies with equal force to our voluntary-confession analysis. As discussed above, Perez's personal characteristics, including his age, education level, and lack of mental health or substance abuse history, support a voluntary confession. *Perez*, 2023 WL 1992721, at *6. He also received a *Miranda* warning before his detention and interrogation, which lasted less than two hours. *Id.* at *1, *6. He was detained for only twenty-two minutes before the interrogation and interrogated for under an hour. *Id.* at *6. No law-enforcement officer used or threatened physical force against Perez. *Id.* These factors support a voluntary confession.

On appeal, Perez accuses Agent Olberding of using "a panoply of psychologically coercive tactics in order to compel [] Perez to make statements against his own interest." Op. Br. at 25. This argument addresses part of the third factor—the questioning's nature. *See Pena*, 115 F.4th at 1261. Perez claims that twelve "tactics" rendered his confession involuntary:

> 1. An overwhelming show of military-style force in Mr. Perez's arrest;
>
> 2. Failing to pause after the administration of *Miranda* (to ensure Perez's understanding and intention to waive silence and counsel);

34

3. Interrogation of Mr. Perez at a law enforcement facility with 3-4 officers in the room, under circumstances that indicate nobody knew of Perez's location, and while Olberding maintained custody of Perez's phone;

4. Invocation of Olberding's "federal" authority and knowledge and experience with federal prosecutions, knowing Mr. Perez had no prior experience in the federal criminal system;

5. The presentation of a false dilemma to Mr. Perez regarding cooperation;

6. The presentation of a sense of urgency to Mr. Perez about the timing of cooperation;

7. The invocation of Mr. Perez's children, their youth, and the suggestion of Mr. Perez's absence from their life if he did not cooperate;

8. Pretending, falsely, to have surveillance evidence that did not exist;

9. Pretending, falsely, to know what an attorney would advise Perez, and then giving that advice to Perez as a hypothetical attorney;

10. Offering Perez leniency, including suggesting that Olberding had the authority of a United States Attorney to take things as far as Olberding wanted, and that Olberding might decide not to arrest Perez if Perez cooperated;

11. Telling Perez that Olberding would put Perez in front of a judge "tomorrow" if Perez failed to cooperate; and

12. Cursing and becoming hostile when Perez was insufficiently self-incriminating.

Op. Br. at 25–26. Upon review, we find that none of these tactics, either alone or in totality, rendered Perez's statements involuntary. In considering each tactic, we are mindful that a confession "must not be . . . obtained by compulsion or inducement of any sort." *Young*, 964 F.3d at 942 (quoting *Griffin v. Strong*, 983 F.2d 1540, 1542 (10th Cir. 1993)). A custodial interrogation

35

must balance two competing concerns—"the need for police questioning as a tool for effective enforcement of criminal laws" and the need to protect against "constitutionally impermissible compulsion." *Moran*, 475 U.S. at 426 (internal quotation marks omitted). We review whether each tactic breached the "fine line" that separates "legitimate efforts to elicit admissions" from "constitutionally impermissible compulsion." *Id.* And then, we consider whether the totality of the tactics rendered Perez's statements involuntary.

To start, Tactics 2, 3, and 4 are not objectively coercive and do not amount to police overreach. We easily dispose of Tactic 2 given our prior conclusion that Agent Olberding's failure to pause did not result in an unknowing *Miranda* waiver. Tactics 3 and 4 appear to represent standard police practices and do not contribute much, if anything, to the coercive nature of the interrogation. We fail to see how these tactics go beyond "legitimate efforts to elicit admissions." *Id.*

For Tactic 1, Perez's vague assertion about the necessary amount of police force rings hollow. He provides no details or case law supporting his claim that the ten armed DEA agents qualify as an unreasonable or overwhelming use of force. The government on the other hand argues that "the agents used only the amount of force necessary to arrest Perez and maintain control over the scene." Resp. Br. at 39. We have recognized the "dangerous combination of drugs and guns" often present in drug-trafficking cases. *United States v. Lindsey*, 389 F.3d 1334, 1338 (10th Cir. 2004) (internal quotation

marks omitted). Unlike mere possession, drug trafficking introduces a host of dangers to the community. The illegal drug trade inherently involves large sums of cash, contraband, and incentive to protect these valuables using force if necessary. Often, that enforcement involves guns. Here, law enforcement knew that Perez managed a drug-trafficking conspiracy and sold kilogram-quantities of methamphetamine, as well as fentanyl pills. His single transaction with Tapia amounted to a $4,000 payment to transport the three pounds of methamphetamine to him. Under these circumstances, police officers reasonably brought back-up officers and firearms to confront Perez at the suspected drug-trafficking scene. Without more, we decline to second guess the assessment of force necessary to protect the officers from danger. This tactic does not amount to impermissible coercion. *See Moran*, 475 U.S. at 426.

Tactics 5 and 11 invoke potential penalties that Perez may face for his actions. As discussed in the *Miranda*-waiver section, Agent Olberding did not misrepresent any potential penalties. Perez was ultimately indicted on charges that carried a mandatory minimum of ten years and a maximum of life in prison. His failure to cooperate also resulted in his arrest and pretrial detention. Agent Olberding accurately described the penalties, so this discussion of penalties does not support an involuntary confession. *See Young*, 964 F.3d at 944.

Tactics 5, 6, 10, and 11 involve Agent Olberding's attempts to convince Perez to cooperate in exchange for his release that day and a heavily implied

reduction in sentence. Again, as discussed in the *Miranda*-waiver section, Agent Olberding's statements correctly reflected the potential benefits of cooperation. *See id.*

But even without any misrepresentations on cooperation, Perez still argues that Agent Olberding's statements on cooperation qualify as promises of leniency, rendering his confession involuntary. Though the district court ultimately determined that the totality of the circumstances favored a voluntary confession, it agreed with Perez on the promise-of-leniency issue. *Perez*, 2023 WL 1992721, at *6. The court found that "Olberding's statements were . . . a promise of leniency," because the agent said that he "did not have to charge [Perez] and . . . could keep him as a confidential source" if he cooperated with law enforcement. *Id.* at *5–6. On appeal, the government challenges the district court's finding and argues that Agent Olberding's statements do not rise to a promise of leniency. We review the district court's promise-of-leniency determination for clear error. *See Young*, 964 F.3d at 943.

We analyze Agent Olberding's statements, separated into three categories, and evaluate whether any or all qualify as promises of leniency.[15]

***(1) Cooperation from Co-Conspirators:*** Agent Olberding commented on cooperation from Perez's co-conspirators. He insinuated that they were "not in

---

[15] On appeal, the parties discuss other statements from Agent Olberding that did not appear to factor into the district court's promise-of-leniency finding. We review these statements as well to address the parties' arguments.

jail" because of their cooperation, Ex. 1 at 0:03:25–0:03:42, and stated, "I have people like you that help me out because they don't want to go to prison for ten years," Ex. 2 at 0:10:45–0:10:50. "But our precedent distinguishes implications [of leniency] from promises of leniency, and we have already held that law enforcement does not make an impermissible promise of leniency by telling a suspect about 'past criminals' who received more lenient sentences for cooperating." *Pena*, 115 F.4th at 1260. These comments therefore do not amount to a promise of leniency or qualify as coercive police conduct.

*(2) Implied Sentence-Reduction Comments:* Agent Olberding also heavily implied at various points that Perez's cooperation would result in a sentence reduction. *See* Ex. 1 at 0:00:37–0:01:09 (stating "[s]o if you wanna help yourself, now is the time to do it" after describing "a deal with two other people"), 0:01:48–0:02:02 (giving Perez "one opportunity" to "help [himself] out"); Ex. 3 at 0:12:38–0:13:09 (acting as Perez's hypothetical attorney and advising that "the only way [Perez will] get any kind of sentence reduction is cooperation"). These statements track the statements we reviewed in *United States v. Roman-Zarate*, 115 F.3d 778 (10th Cir. 1997). There, in response to an agent's inquiry on cooperation, the defendant asked what the agent "meant by cooperating." *Id.* at 780. The agent explained that he "wondered if [the defendant] 'were going to help [himself] out' by assisting in the investigation." *Id.* The agent also clarified that "the agents could not guarantee leniency, but that cooperation could help [the defendant]." *Id.* We held that these statements

39

only qualified as a "limited assurance" that did "not taint ensuing statements as involuntary." *Id.* at 783 (internal quotation marks omitted).

Agent Olberding's statements about Perez "helping" himself out and about cooperation as "the only way" for a sentence reduction similarly do not rise to a promise of leniency. Agent Olberding did not guarantee that cooperation would result in leniency. He merely described cooperation as the sole option for Perez to pursue a sentence reduction. As discussed in the prior section, our review of Perez's criminal history and relevant conduct supports this assertion. These accurate statements do not amount to a promise of leniency.

**(3) "Cuffs Off" in Exchange for Cooperation:** At multiple points in the interrogation, Agent Olberding stated that if Perez failed to cooperate with law enforcement, he would send Perez to jail that day and charge Perez for drug-related crimes. *See* Ex. 1 at 0:00:45–0:01:09 ("[B]ut if you don't want to talk to me, you don't want to do anything, I have [the prosecutor's] permission imma take you to jail in Topeka, you're gonna be in front of a magistrate judge tomorrow, you're gonna be advised of your charges, you're looking at ten to life."), 0:02:57–0:03:17; Ex. 3 at 0:12:11–0:12:18 (stating that if Perez could not "help" him, he would "put the cuffs back on," "transport [Perez] to Topeka," and "put [Perez] in front of a judge tomorrow"). But, according to Agent Olberding, if Perez wanted to "help [himself] out," the two could "go talk," and Agent Olberding could "get [Perez] out of here, get [Perez] out of

40

[his] cuffs, clear this shit up." Ex. 1 at 0:01:48–0:02:02. In short, Agent Olberding dangled the possibility of delayed charges or no charges in exchange for Perez's full cooperation. *See Perez*, 2023 WL 1992721, at *5 ("If Perez provided something 'actionable,' it appears Olberding was being truthful in telling Perez he did not have to charge him and that he could keep him as a confidential source."). The agent's promises of leniency depended on Perez's full cooperation before he earned the leniency. That is, if Perez told the full truth about his involvement in the conspiracy and assisted the investigation as had the referenced cooperating co-conspirators, leniency would follow. But Perez, unlike defendants in other cases, inched toward the cooperation precipice and then pulled back. *Cf. Young*, 964 F.3d at 942–43 (defendant confessed to drug distribution after being told that he could physically buy down his time in prison with each truthful answer); *United States v. Lopez*, 437 F.3d 1059, 1061–62 (10th Cir. 2006) (defendant confessed to shooting the victim by mistake after being told that confessing to a mistaken killing would result in six years' imprisonment, whereas a murder conviction would result in sixty years).

A promise of leniency does not automatically render a confession involuntary. *Young*, 964 F.3d at 944. But the promise is "relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced." *Id.* (internal quotation marks omitted). We have held that "vague and non-committal"

41

statements amounting to a "limited assurance" are a "permissible interrogation tactic." *United States v. Rodebaugh*, 798 F.3d 1281, 1293 (10th Cir. 2015) (internal quotation marks omitted) (concluding that an agent's statement, "If you work with us, we'll go easy on you," was at most a limited assurance). Likewise, "a statement to inform the prosecutor of a defendant's cooperation without any other indications of coercion does not constitute a promise of leniency." *United States v. Nguyen*, 155 F.3d 1219, 1223 (10th Cir. 1998). On the other end of the spectrum, we have found promises of leniency where the agent expressly (and falsely) promised a sentence reduction in exchange for a confession. *See Young*, 964 F.3d at 944 (concluding that an agent's statements that the defendant's cooperation could "physically buy down the amount of time [he] see[s] in a federal prison" and that each truthful answer would "tick[] time off that record" were promises of leniency (internal quotation marks omitted)); *Lopez*, 437 F.3d at 1064–65 (same where an agent wrote the terms "murder," "mistake," "60," and "6" to convey that a confession to a mistaken killing would result in only six years' imprisonment, whereas a failure to confess would result in a murder conviction with sixty years' imprisonment).

Our case falls somewhere in the middle. Agent Olberding's statements do not rise to the level of an explicit promise to decrease Perez's period of imprisonment in exchange for his cooperation, as in *Young* and *Lopez*. But we will assume for argument's sake that the agent's statement that he would "get [Perez] out of here, get [Perez] out of [his] cuffs, clear this shit up," amounts to

more than a vague and non-committal statement.[16] Ex. 1 at 0:01:48–0:02:02. It includes direct actions that Agent Olberding promised in exchange for Perez's cooperation. And on the flip side, Agent Olberding made it clear that a failure to cooperate would result in criminal charges and a ride to jail that day. Yet even assuming these statements qualified as a promise of leniency, they did not render Perez "so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action." *Rodebaugh*, 798 F.3d at 1293 (internal quotation marks omitted). In fact, the circumstances suggest otherwise. As mentioned, Perez treated the interrogation like a negotiation. He admitted to minimal amounts of drugs, while not revealing the extent of his knowledge and involvement. And as evidence that these statements did not overbear his will, we note that he didn't cooperate. When viewed against the totality of the circumstances, we conclude that Agent Olberding's statements did not make Perez's statements involuntary.

Now we move to the next allegedly coercive police tactic. Tactic 7 deals with Agent Olberding's comments about Perez's children. Specifically, he asked about Perez's children, their ages, and their relationships with Perez. Ex. 3 at 0:10:50–0:11:25. He then stated that Perez faced "ten to life" in prison. *Id.* at 0:11:25–0:11:33. Perez argues that these statements contributed to a coercive interrogation by suggesting Perez's absence from his children's lives

---

[16] We note that the promises were conditional on Perez's full cooperation, which Perez never gave.

if he did not cooperate. We disagree. Agent Olberding's comment described a likely collateral consequence of incarceration, amounting to no more than a commonsense statement of fact. And the record does not suggest to us that Perez reacted to or weakened from this stated reality. His brief reference to Perez's children, lasting less than a minute, does not contribute much, if anything, to suggest a coercive interrogation. *See United States v. Little*, 119 F.4th 750, 776 (10th Cir. 2024) (concluding that the officer's statement about the defendant "being separated indefinitely" from his son if convicted of first-degree murder does "not weigh heavily for a finding of involuntariness" because the defendant was "calm and level-headed throughout the interview" (internal quotation marks omitted)); *Pena*, 115 F.4th at 1261–62 (concluding that the defendant's confession was voluntary despite "uncivil" and "troubling" law enforcement conduct, including "implying that Defendant's children might commit suicide because of Defendant's actions").

Tactics 8 and 9 address the allegedly false information that Agent Olberding provided to Perez during the interrogation. Perez argues that Agent Olberding misrepresented that he had information about Perez at a bar with Tapia and falsely claimed to know how an attorney would advise Perez. "[A]n officer's deceptions or misrepresentations may, but do not necessarily, render a confession coerced." *Young*, 964 F.3d at 943. For the misrepresentation about Tapia and Perez at a bar, the government acknowledges the falsity of this statement. But we agree with the government that this misrepresentation did not

contribute much to the coercive nature of the interrogation. *See Little*, 119 F.4th at 776 (finding the officer's reliance on "false evidence and deceit . . . do[es] not strongly support the conclusion that Little's statements were involuntary"). The entire interaction lasted less than fifteen seconds. Perez immediately denied the statement, and Agent Olberding moved on to the next topic. These circumstances leave us hard-pressed to find any materially significant coercion from the brief interaction.

Somewhat more problematic is Agent Olberding's prediction about what Perez's future counsel would later tell him about the value of cooperating with law enforcement.[17] Even the government calls this comment "inadvisable." "Courts are much less likely to tolerate misrepresentations of law." *Young*, 964 F.3d at 944 (cleaned up). In *Young*, we held that the agent's misrepresentation of penalties, along with false promises of leniency, made a confession involuntary. *Id.* at 944–46. But unlike the agent in *Young*, Agent Olberding did not misrepresent the law. Whether through sheer luck or thorough knowledge of the law, Agent Olberding accurately stated that Perez's only avenues for a

---

[17] Reviewing the interrogation in totality, we are also convinced that Agent Olberding's statements did not undermine Perez's right to counsel. At no point during the voluntary interrogation did Perez express interest in delaying any questioning until he was appointed an attorney. At Agent Olberding's first mention of hypothetical advice from Perez's future attorney, Perez interrupted him and asked, "So what do you want me to tell you?" Ex. 1 at 0:02:57–0:03:18. And after another mention, Perez simply continued his denials about being involved in the drug conspiracy. Ex. 3 at 0:12:30–0:13:09, 0:13:40–0:13:46.

sentence reduction are cooperation or acceptance of responsibility. Nothing that Agent Olberding advised tipped the interrogation to impermissible coercion. If anything, the target of this alleged coercion seemed unfazed by his statements. When Agent Olberding first began to speculate about Perez's legal options, Perez even interrupted him, asking "So what do you want me to tell you?" Ex. 1 at 0:02:57–0:03:15. Perez understood the give-and-take nature of this interrogation and acted accordingly to maximize the potential benefit.

Finally, Tactic 12 consists of Perez's complaints that Agent Olberding "curs[ed] and bec[ame] hostile when Perez was insufficiently self-incriminating." Op. Br. at 26. Perez does not specify which portion of the interrogation this tactic refers to, but we have identified two parts that contain profane language in response to a lack of incriminating statements: (1) When Perez denied that his "girl" planned to pick up "dope" in California that week, Agent Olberding responded, "Bullshit," Ex. 3 at 0:04:10–0:04:31, and (2) midway through the interrogation, at which point Perez had admitted to only four ounces of methamphetamine, Agent Olberding stated, "My case is fucking rock solid. You'll be locked up at least ten years," *id.* at 0:12:30–0:12:37.

We disagree with Perez's characterization that Agent Olberding became hostile at these portions of the interrogation. The audio recording shows that Agent Olberding maintained a calm tone and employed profanity to emphasize the strength of his case. He did not direct that profanity at Perez personally.

46

And we note that Perez used profanity in the same manner during the interrogation. *See* Ex. 3 at 0:07:33–0:07:38 (stating that his "baby mama's" family is "a fucking mess" and that he "fucking hate[s] them"). Under these circumstances, Agent Olberding's use of profanity contributes little to Perez's claim of coercion. *See Pena*, 115 F.4th at 1261 (finding a voluntary confession where agents spoke in "loud voices," implied the defendant's children might commit suicide because of his actions, and invited the defendant's ex-wife to speak with him); *United States v. Mullin*, 178 F.3d 334, 341–42 (5th Cir. 1999) (finding a voluntary confession despite the defendant's claim that Military Police yelled and cursed at him).

None of the twelve tactics individually create a coerced confession. And in totality, these tactics do not create a coercive environment either. In fact, we view Perez's decision to incriminate himself in relation to smaller quantities of drugs as "the result of calculation not coercion." *Roman-Zarate*, 115 F.3d at 783. The lack of intimidation was particularly evident given that Perez felt comfortable enough to call Agent Olberding "bud." Agent Olberding and Perez matched wits in a cat-and-mouse game, during which Perez willingly admitted some drug activity but denied his full role and responsibility. And with these tactics in the context of other factors set out above, we conclude that Perez voluntarily made his incriminating statements under the totality of the circumstances. Nothing about this interrogation suggests that Perez's will was overborne. He made incriminating statements while trying to satisfy Agent

Olberding and cut the best deal for himself. He can't complain now that his minimization strategy failed.

For these reasons, we affirm the district court's decision to admit Perez's post-*Miranda* statements.

## III.  Cell-Phone Search

Finally, Perez asserts that the district court erred by admitting the contents of his cell phone based on his consent to the search. "To admit evidence obtained in a consent search, a district court must find from the totality of the circumstances that (1) the defendant's consent to an officer's search was voluntary and (2) the search did not exceed the scope of the defendant's consent." *United States v. Price*, 925 F.2d 1268, 1270 (10th Cir. 1991). Perez attacks the first prong, arguing that he did not voluntarily consent to a search of his cell phone.

Because we already concluded that law enforcement did not coerce Perez into making any statements during his interrogation, we likewise conclude that Perez voluntarily consented to the phone search. Indeed, he consented at least three times to Agent Olberding's viewing his cell phone and even first volunteered, without prompting, that Agent Olberding could examine his phone to see that he supposedly had not communicated with Tapia about drugs. Ex. 3 at 0:04:57–0:05:07, 0:05:44–0:05:48, 0:21:23–0:21:39. Under these circumstances, the district court properly admitted the contents of Perez's cell phone.

**CONCLUSION**

We affirm the district court's denial of suppression.